IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CR420 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| AMPHAYVANH ALSTATT and | ) | |
| EDWARD ALSTATT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court following a criminal trial to the bench. The Indictment charges defendants in Count I with conspiracy to commit peonage against Mr. Ae Xaypayna and Ms. Noy Vilay in violation of 18 U.S.C. §§ 1581, 1590, and 1592(a); in Count II with trafficking with respect to peonage against Ae Xaypayna and aiding and abetting each other in violation of 18 U.S.C. §§ 1581, 1594 and 2; and in Count III with document servitude, aiding and abetting one another against Ae Xaypayna and Noy Vilay, in violation of 18 U.S.C. §§ 1592 and 2. Count IV charges defendant Amphayvanh Alstatt ("Am Alstatt") with making false statements in violation of 18 U.S.C. § 1001. Defendants are married. Am Alstatt is of Laotian descent and is a lawful permanent resident. Edward Alstatt is a United States born citizen.

The court has reviewed the evidence, the testimony, the relevant case law, and considered the arguments of counsel. The court finds the defendants not guilty of the charges set forth in the Indictment in Counts I, II, and III, and finds Am Alstatt guilty of the charges set forth in Count IV. The court makes the following findings.

**Background and Testimony**

Defendants have assisted a significant number of Laotian immigrants with the application process for entering the United States. This process occurs through the Diversity Visa Lottery program, 22 C.F.R. § 42.33. The lottery winners are randomly selected and would include spouses, if applicable. If the winner passes an interview, that person and spouse would receive visas to enter the United States. The winner then receives a permanent resident card and later receives a green card. The trial testimony of Ms. Joanne Howe, an immigration service officer, indicated the approximate cost to come through this program is about $1,100 in fees. Trial Transcript ("Tr."), Filing No. 93, 15:23-16:2. She further testified that it is not unusual for applicants to have a representative to help them. *Id.* at 32:10-25.

Defendant Am Alstatt represented all of the 2007 Diversity Visa Lottery winners from Laos. Two of Am Alstatt's lottery winners were Ms. Noy Vilay ("Vilay") and Ms. Phoukham Lattachack ("Lattachack"). These two lottery winners are the alleged victims in the government's indictment. The allegations span from the Summer of 2007 through the Fall of 2008. In September 2007, Mr. Ae Xaypayna ("Xaypayna") entered the United States with defendant Am Alstatt as the husband of Lattachack. Xaypayna was in his late twenties at this time and is Am Alstatt's cousin. Xaypayna apparently married after Lattachack won the lottery. The evidence supports the government's assertion that the marriage documents were altered, probably by Am Alstatt. Approximately 120 immigrants listed defendants' home or business on their applications for immigration. Defendants were assisted by Teng Sysouvanh, Am Alstatt's sister, who advised applicants that the cost would be about $3,000 per person and $5,000 per family, if they were selected.

Xaypayna testified that Am Alstatt gave him instructions on how to get to the United States.  Am Alstatt introduced him to Lattachack and told him he needed to marry her in Laos.  They married, filed their documents, and moved to Minnesota.  He was there for a week, and at that time he was picked up by Ed Alstatt, taken to Omaha and then to New Orleans.  He was allegedly told by Am Alstatt that he would receive $1,500 per month for his work in New Orleans.  He testified that he received no money for the months he worked in New Orleans.  He initially retained possession of his passport during this time.  At some point during his stay in New Orleans, he gave his passport temporarily to Am Alstatt to purchase a plane ticket.  It is not clear when she returned it to him.  He then went to work at Men's Wearhouse in Sioux City, Iowa, and later to Columbia, Missouri.  His green card and Social Security card were originally sent to the Alstatt address in Omaha while he worked in New Orleans.  At some point he had possession of both cards.  He testified he gave his passport and both cards to Am Alstatt at her request about ten days after he first went to Columbia, Missouri, in May 2008 (Tr., Filing No. 95 at 479:18-23).  She retained the documents until he retrieved them during a tape-recorded conversation on October 9, 2008.

In February 2008, Xaypayna finished working in New Orleans and returned to Omaha with Ed Alstatt.  He worked in Am Alstatt's tailor shop a short time in order to learn enough to pass a tailoring test for Men's Wearhouse.  After passing the test, he went to the Sioux City, Iowa, store to work along with Ms. Vilay.  There they shared a car provided by the Alstatts.  He initially received $12 per hour.  He was offered and accepted $14.50 to work in the Columbia, Missouri, store in May 2008.  He continued to use the Alstatt vehicle during this job.  He testified that he made the move in order to make more money.

Approximately three months after his move to Columbia, he contends that he began asking Am Alstatt for the return of his documents. According to Xaypayna, Am Alstatt first told him it would cost $25,000 to get his documents back. Am Alstatt denies this allegation. On September 15, 2008, Xaypayna and his cousin, Ms. Bounthanh Sriharath, went to the Alstatts' shop to retrieve his documents, where they encountered Ed Alstatt at the tailor shop. He did not give them the documents. They then left and went to Xaypanya's bank to close two bank accounts he held jointly with Ed Alstatt. At the bank he learned that Ed Alstatt had taken approximately $3,500 out of his account leaving him with less than $150. The Alstatts argue this money was for the payment of a car they sold to Xaypayna and Vilay. That same day Xaypayna and his cousin left the "purchased" vehicle at the Alstatt home. Xaypayna contacted the police. Thereafter, Agent Charles Bautch contacted Xaypayna.

On cross-examination, Xaypayna testified that he learned after he reached the United States that Am Alstatt paid the $1,500 filing fee while he was still in Laos, as well as food and plane tickets and motel charges.

Ms. Lattachack testified that she and Xaypayna had a marriage celebration in 2006 and that she had known him the year prior to the marriage. Am Alstatt sent her the money for the documents and paid most of the expenses associated with the admission to the United States, including plane tickets and hotel rooms.

Charles Bautch, Special Agent with Department of Homeland Security, Immigration and Customs Enforcement, testified that he received a complaint in September 2008, from Xaypayna that Am Alstatt had possession of his immigration documents and would not return them until he paid her $25,000. Tr., Filing No. 93, at 51:5-23. Xaypayna testified

that he originally liked the idea of defendants holding his documents, but later wanted them returned. Special Agent Bautch and other agents interviewed Xaypayna. Thereafter, they subpoenaed the Alstatts' bank documents. *Id.* at 55. On October 9, 2008, Agent Bautch arranged a recorded telephone conversation between Xaypayna and Am Alstatt regarding the return of his documents (Ex. 523).

Agent Bautch then had Xaypayna travel to Omaha in an attempt to retrieve the documents from Am Alstatt.[1] On October 20, 2008, Immigration and Customs Enforcement ("ICE") officers recorded a conversation between Xaypayna and Am Alstatt that occurred in the Alsatt shop (Ex. 522). Xaypayna and Ed Alstatt then left the shop and went to the bank.[2] They returned to the shop where Xaypayna finally obtained his immigration documents and Social Security card. The government argues that Am Alstatt

---

[1]When questioned during trial, Agent Bautch testified:

Q. As part of that discussion, did you come to understand that in discussing this debt that Miss Alstatt said the following: Didn't I tell you before? Let me get a paper and pencil to add it up. The cost for lawyer is 6,000. The cost for plane ticket for two of you is 3,000 and the last, cost of paying to other people that you owed is 1,500, is it right? Add it up, how much is it? 10,500, right?

Is that a true and accurate recitation on my part of what was set forth in the transcript?

A. Yes.

Q. She then continues: Lawyer and all the paperwork, I told all of you, not just you, Noy too, right, Noy, about the 6,000? The 3,000 is the airplane ticket and the 1,500 is the money you borrow from someone. The 1,500 you work for us, me, and your uncle for one month, we will pay you 1,500, subtract that, now you owe me 9,000. Is that right?

Is that a fair and accurate reading of what appears on the transcript?

A. Yes.

Tr., Filing No. 94, pp. 291:12-292:5.

[2]Xaypayna and Ed Alstatt actually went to the bank two times to have the contract notarized.

threatened to send Xaypayna back to Laos.[3]  Xaypayna was told that he could not have

his documents returned until he signed a $9,000 promissory note with 5% interest per

month (nominal annual rate of 60%, effective annual rate of nearly 80%).  He signed the

note and received the documents.  Defendants offered no receipts or documents to

support their claim that Xaypayna owed them this money, other than airfare in the amount

of $350 regarding the Louisiana trip to work for Ed Alstatt.  During the ICE search,

discussed hereinafter, a similar contract was located for an alleged debt in the amount of

$15,000 to bring Am Alstatt's niece,  Bounthanh Sriharath, to the United States. The

defendants held joint bank accounts with a number of immigrants, including Xaypayna and

Vilay.

Agent Bautch subsequently obtained a search warrant for search of the residence,

business, and vehicles.  He  testified that they found account statements from Wells Fargo

which were joint accounts between Laotian individuals with either Am or Ed Alstatt.  Filing

No. 93, Tr. at 117:1-25.   Agent Bautch also found hundreds of files that had been

maintained by the Alstatts with photocopies of payments made to the Alstatts.  Filing No.

---

[3]The particular statement in question is:

"Let me tell you, if you guy created problem yourselves and get arrested, do not blame it on
me that I reported you.  I will never do such a thing.  I wanted to hear from you mouth that do
you want to stay or go back?  If you want to go back, tell me nicely, you don't have to pay any
thing. If you want to stay, stay peacefully, if you don't want to stay peacefully, tell me that you
want to go back and I will send you back, you do not have to pay to go back.  I will not report
you."  Exhibit 523, page 4.

Mrs. Alstatt testified that this was not a threat and explained the reason why she made that statement
to Mr. Xaypayna:

"Well, in our culture when you – when you bring – when you help somebody to United States
– to enter to United State, our culture, we always offer – if they not happy in this country,
where would they go, and if they unhappy, I always have the right to asking them to make
sure that they – they're not happy to stay here, and if they want to return, I'll be happy to send
them back with my own expense."  (Filing No. 100, Tr. at 1498:17-23.)

93, Tr. at 116:5-17. Agent Bautch testified that Exhibits 525 and 528 show a debt contract or loan agreement in the principal amount of $9,000, that becomes $17,819.38 with interest, which Xaypayna signed with the Alstatts. Xaypayna received his documents after signing this loan agreement. Also found were blank immigration forms and other official documents that appeared to be altered. On cross-examination, Agent Bautch testified that Xaypayna's wages from Men's Wearhouse in Missouri were deposited into the joint account of Xaypayna and Ed Alstatt. Filing No. 94, Tr. at 219:23-220:16.

When agents executed the warrant, they did not find Vilay's green card, Social Security card, and Laotian passport. When asked, Vilay first said these documents were in Sioux City and then later stated that the defendants had possession of them.

Ms. Bounthanh Sriharath testified for the government. She petitioned to come to the United States with her fianceé. Her mother is Am Alstatt's sister. She testified that she worked in the Alstatt's shop ten-hour days, six days a week, and did not get paid for her work, for a period of several months. Filing No. 94, Tr. at 321:2-322:13. She further testified that for the three months she lived with the Alstatts that she and her husband paid no money for food, rent, or utilities, although she and her husband paid for their own food when they went out to eat. She also corroborated Xaypayna's testimony concerning the events of September 15, 2008, when he attempted to retrieve his immigration documents from the defendants.

Teng Sysouvanh testified that Am Alstatt is her younger sister. She testified that her sister gave her documents to give to people in Laos, and that her son brought the documents back to her. According to Teng, Am Alstatt told her the cost to get one person to the United States was $3,000 and $5,000 for a family. Teng was arrested in Laos for

twelve days.  She then stopped doing the paperwork for Am Alstatt.  Teng also testified

that the marriage between Xaypayna and Lattachack  was not real; it served only as a

means to get Xaypayna in the United States.  She further testified, when asked by

government counsel:

> Q.    Okay. Your sister indicated that she would not return the
>        documents until this was cleared up and she had $25,000; is
>        that a fair statement?
>
> A.    Yes.

Filing No.95, Tr. at 423:1-5.

Mr. Ajan Samur Promskkan also testified that he spoke to Xaypayna who seemed

happy with his job in New Orleans.  Further, he testified that the Alstatts took Xaypayna on

several trips including a trip to Lincoln, Nebraska, during the latter part of 2007 and early

2008; a skiing trip in Colorado during the Christmas break in December 2007; and a trip

to Texas in November 2007.   Ms. Vilay testified that a woman by the name of Mom

Chansamone helped with her documents and then Am Alstatt helped her with the

documents.  She testified that Mom Chansamone paid for her documents and the money

came from Am Alstatt.  Am Alstatt also paid for her air fare, hotels and expenses from Laos

to the United States.  She testified she is married but her husband did not come with her

to the United States. On cross-examination, she admitted that her husband came with her

to the United States Consulate in Laos.  He wanted to immigrate to the United States

through her Lottery Visa.  She stated that she and her husband married about the same

time Xaypayna married.  The United States Consulate did not authorize his immigration

because he did not pass the interview.  The interview focused on questions concerning the

legitimacy of her marriage.

When Vilay arrived in the United States, she stayed at Am Alstatt's home for about five to six months. Vilay testified that her mother paid Am Alstatt about $6,000. Filing No. 98, Tr. at 933:7-23. Am Alstatt paid for her living expenses and her food, helped her find jobs, and taught her to sew. Am Alstatt helped her open a bank account, as she did not speak English very well at the time. Vilay named Am Alstatt the beneficiary of her work life insurance. She testified that Am Alstatt told her the beneficiary could not be a family member in Laos. Am Alstatt promised to deliver the money to relatives if the insurance was paid. Vilay testified that she retained her own passport, green card, and Social Security card after she received them. However, when questioned by agents during the investigation, she "realized they were at Mom Am's house." Filing No. 98, Tr. at 1030:7-19. She further testified that she kept all her documents until she received a driver's license, and then, pursuant to a suggestion from Am Alstatt, she turned the remaining documents over to Am Alstatt.

Vilay returned $900 to her mother and testified that she sent money from her wages home to her family, although she did not remember exactly how she sent the money home. On cross-examination, she recalled she sent $3,000 home to her family through an unknown courier arranged by Am Alstatt. She additionally testified that Am Alstatt did not ever take money out of her checking or savings accounts without her permission. Am Alstatt also gave her a phone. She testified that she and Xaypayna agreed to purchase Alstatt's daughter's car together and pay for the insurance and repairs. The car needed repairs at some point. Ms. Alstatt had it repaired, and Vilay paid her half of the costs but never purchased the car. She did not believe that Xaypayna ever paid the other half of the repairs. Throughout her testimony she maintained that her relationship with the Alstatts was completely voluntary.

Edward Alstatt took the stand. Ed Alstatt has a bachelor's degree from Mesa College and served in the military. After working a number of years for the railroad, he joined Am Alstatt in running their own business selling men's clothing, accessories, and alterations. He speaks a little Laotian and leaves the immigration business to his wife. At the time of the New Orleans trip which occurred in October 2007, he renovated and rehabilitated houses. They returned from New Orleans in February 2008. His testimony shows that he and his wife paid the airline tickets and expenses for Noy Vilay, Phoukham Lattachack, and Ae Xaypayna. Ed Alstatt took Xaypayna with him to New Orleans because he and his wife did not know what else to do with him. They expected him to live and work in Minnesota until he advised them otherwise. He testified that Xaypayna's abilities were limited at that time, but that he did help. Xaypayna seemed happy with being there. When Ed Alstatt returned to Omaha for a week, Xaypayna stayed in New Orleans and Mr. Alstatt gave him a cell phone and money. He testified that they went to Keller, Texas, for a festival at a Buddhist temple and at Thanksgiving they went to New Orleans where he met up with Am Alstatt, Noy Vilay, and Xaypayna's wife. They also met with other recent immigrants. They returned to Omaha in December and had a gathering of Laotians and monks for Christmas. Thereafter, they all went on a ski trip in Colorado.

After Christmas, in February 2008, Ed Alstatt assisted Xaypayna with opening a joint checking account at Wells Fargo Bank. He did so because Xaypayna did not speak English, did not understand the banking system, could not get overdraft protection without a credit-worthy joint owner, and they both felt like it was a good idea. He testified that Vilay and Xaypayna purchased a car from his family for $3,000 for use in Sioux City. There was no written purchase agreement and the title was never executed, as Vilay and Xaypayna did not immediately have the purchase money. This is the same vehicle that Xaypanya

took for his job in Columbia, Missouri. He further testified that they trained Xaypayna to become a tailor and then found him a job.

Am Alstatt testified on her own behalf. Filing No. 100, Tr. at 1349. She testified that she kept the documents for Xaypayna and others for safekeeping purposes. She is from Laos and has been in the United States for 30 years. She has three children who still live at home. She risked her life to come to the United States. She has been a tailor for 20 years. She learned of the Diversity Lottery program and contacted her sister (Teng) and her friend (Toui), indicating she would like to help Laotians apply for the program. She first assisted with the applications in 2005. She initially had six successful applicants. In 2007, she helped the subject immigrants gather the required documents. She traveled to Laos, met with the Consulate, and then escorted the three individuals back to the United States, all at her expense. She estimated that the total travel costs for the three immigrants exceeded $5,000. Later she submitted a bill to Xaypayna for his and his wife's expenses. Ms. Vilay's family gave Am Alstatt about $6,000. Am Alstatt trained Vilay and Xaypanya to become tailors. She allowed them to use her daughter's car. Ed and Am Alstatt provided the transportation to and from work for them. She eventually agreed to sell her daughter's car to Vilay and Xaypayna for $3,000.

Am Alstatt testified that the first day she was asked for the return of Xaypayna's documents was the day law enforcement tape-recorded their phone call. She further testified that her statements to Xaypayna were not meant to threaten him, but pursuant to her culture, these statements were meant to indicate she could send him back at her expense. She denied asking Xaypayna for money owed to her. Ms. Alstatt admits that on the day Xaypayna came to her to get his documents, she had him sign a $9,000 note. Ms.

Alstatt testified that she came up with the 5% a month interest rate because, in Laos, the rate would be 10% per month.

Thongsavath Sinthavong also came to the United States with the help of Am Alstatt. His N-400 Application for Naturalization was signed and completed by Am Alstatt. In the section for criminal history, no previous criminal record was listed. He did in fact have two misdemeanor criminal convictions. On the fax cover sheet used by Sinthavong to send the criminal conviction information to Am Alstatt, she wrote that he had a fifty-fifty chance of gaining entry into the United States. Ex. 507. The government contends that this omission was materially false and fraudulent. Am Alstatt argues this was inadvertent and was the responsibility of Sinthavong in any event. Further, Am Alstatt notes that this information was later disclosed and did not affect Sinthavong's application into the United States.

**Count I**

A. Law

Count I charges the defendants with conspiracy to commit peonage. Ed and Am Alstatt are charged with conspiracy to force Xaypayna and Vilay to work in violation of 18 U.S.C. §§ 1581, 1590, and § 1592 (via § 1589)[4] and 1594(b) (conspiracy). They are also

---

[4]18 U.S.C. 1589, Forced Labor, states:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means –

   (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

   (2) by means of serious harm or threats of serious harm to that person or another person;

   (3) by means of the abuse or threatened abuse of law or legal process; or

   (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

charged with conspiring to hold Xaypayna and Vilay in a condition of peonage in violation of 18 U.S.C. § 1581, and with trafficking with respect to peonage, slavery and involuntary servitude or forced labor in violation of 18 U.S.C. § 1590. Count I of the Indictment rests on § 1581, which is the old peonage statute, and it additionally rests on § 1590, which is part of the new peonage statute. Although the government pled every conceivable variation of peonage, the controlling provision relates to the forced labor prohibition of 18 U.S.C. § 1589.

To establish a violation of § 1589, the government must prove that: (1) the defendant provided or obtained the labor or services of another person; (2) the defendant did so by one of the three prohibited means; and (3) the defendant acted knowingly.

The Eighth Circuit has set forth the elements for a violation of 18 U.S.C. § 1581, condition of peonage. The Eighth Circuit has stated: "Thus, in order to prove peonage,

---

shall be punished as provided under subsection (d).

(b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

(c) In this section:

(1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

(2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

the government must show that the defendant intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force." *United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009). The more specific set of elements for conspiracy with respect to peonage are that the government must show beyond a reasonable doubt that the defendants knowingly (1) entered into an agreement or reached an understanding to commit a crime (peonage), (2) and that at least one defendant overtly acted in furtherance of the agreement, and (3) and the agreement was either explicit or implicit. *Id.* at 376.

The relevant provision of § 1581 as specified in § 1589 is whether the defendants obtained the labor or services of the victims by means of abuse or threatened abuse of law or legal process, thus keeping the victims in a state of involuntary servitude. Involuntary servitude is defined as forced or compulsory labor or service for someone else's benefit that a person unwillingly performs because of the use or threat of coercion through law or the legal process, or because of the use or threat of physical restraint or physical injury.[5] A threat of deportation which causes involuntary servitude may be sufficient. *United States v. Kozminski*, 487 U.S. 931, 948 (1988). The Eighth Circuit has stated: "While debt is an element of the peonage charge, we also cannot ignore the creditor-debtor relationship as a source of vulnerability." *Farrell*, 563 F.3d at 374, n.4.

Peonage is "a status or condition of compulsory service" based upon a real or alleged indebtedness. *Bailey v. Alabama*, 219 U.S. 219, 242 (1911); *Pierce v. United*

---

[5] Eleventh Circuit Pattern Jury Instructions.

*States*, 146 F.2d 84, 86 (5th Cir. 1944) ("The amount of the debt, or the means and methods of coercion, are largely irrelevant. It is sufficient to allege and prove that a person is held against his will and made to work to pay a debt." It does not matter that a debtor contracted to perform services or labor for the creditor. *Bailey*, 219 U.S. at 242 ("the full intent of the constitutional provision could be defeated with obvious facility if, through the guides of contracts under which advances had been made, debtors could be held to compulsory service."). "It is sufficient to allege and prove that a person is held against its will and made to work to pay a debt." *Pierce*, 146 F.2d at 86.

B. Discussion

The question before this court is whether the government proved the elements of conspiracy to commit the substantive crimes. In all three of these counts, the peonage, the trafficking and the document servitude, there is a requirement that Xaypayna or Vilay be subjected to peonage or involuntary servitude or forced labor. Ms. Vilay in essence asserts that she is not subject to involuntary servitude by the defendants. Accordingly, the indictment as it relates to her fails.

As for Mr. Xaypayna, the government argues that he was told to go to New Orleans, and while there, he did a significant amount of work essentially without pay. It is clear that Am Alstatt did not initially pay Xaypayna for any of this work, although it does appear that she credited him $1,500 off his indeterminate debt once the debt was reduced to writing and his documents were returned.

Defendants argue that the portion of Section 1589(a) which states whoever knowingly "provides or obtains the labor or services of a person," does not apply because: (1) defendants did not employ anyone; (2) defendants did not require labor or services; and

(3) defendants helped the Laotian immigrants obtain real jobs for regular wages. The government argues that although both immigrants were not employed by the Alstatts, both directly worked without pay in the Alstatt's shop while allegedly learning to sew. Additionally, Mr. Xaypayna worked in New Orleans for what realistically amounted to nothing, because the so-called credit of $1,500 was deducted from a debt that the defendants never fully documented.

Xaypanya first worked for Ed Alstatt in New Orleans while waiting for his immigration documents. There is no evidence that he was coerced or threatened in any way, he was not harmed, he was not abused, and he was not physically restrained, Filing 96, Tr. at 570:24-571:4. Thereafter he came to Omaha where he applied and then became an employee of Men's Wearhouse. He was not employed by the defendants, although he worked a short time in the defendants' shop to learn the tailoring skills necessary to pass the Men's Wearhouse employment test. He did this work willingly.

The only particularly bothersome facts are the debt and its astonishing interest rate. The debt is computed in a mostly indeterminate manner, unsupported by receipts or documentation. The interest rate charged by the Alstatts as evidenced by the contract with Xaypayna, Filing No. 92, Ex. 525, essentially insures unending payments to the Alstatts. This debt load and its computation are unconscionable and abusive.

However, the court does not find that this evidence supports the level of compulsory service or involuntary servitude necessary to satisfy this element. There is no evidence that Xaypayna was held or forced to perform labor to satisfy the debt. There is no evidence that any form of involuntary service was tied to this interest rate or that Xaypayna was held against his will to pay this debt. The government did not prove that any money

was taken from Xaypayna's bank account to pay this amorphous debt other than the amount taken to pay the Alstatts for the car they gave him to use in Sioux City, Iowa, and Columbia, Missouri.

Xaypayna testified that he worked for pay. He agreed during trial that he was not coerced or threatened or abused when he left Minnesota to go to New Orleans and Omaha to work. During that time Xaypayna visited his wife, participated in tourist activities, and went on a ski trip with the Alstatts. Thereafter, Xaypayna received training to become a tailor and went to work for Men's Wearhouse in Sioux City, Iowa. He then moved to Columbia, Missouri, with Men's Wearhouse. He did so voluntarily because he would make more money. Filing No. 95, Tr. at 472:25-473:3.

Xaypayna testified to two alleged threats of deportation. One was recorded by ICE agents during the October 9, 2008, conversations leading up to the Alstatts' arrest. The other alleged threat was a much earlier conversation that was first described in open court during the trial. As to the recorded threats, the statements made by Am Alstatt regarding obtaining legal counsel appear to be in reference to Xaypayna failing to pay his debt and possibly purchasing the car Xaypayna was using. *See* Trial Ex. 523, pp. 11-12. With regard to alleged threats of deportation, defendants argue that such threats were not legitimate, as Xaypayna was not subject to deportation. The green card was valid for ten years. Xaypayna testified that he did not feel threatened by these comments. Further, during the recorded phone call of October 9, 2008, Mrs. Alstatt denied any attempt by her to obtain $25,000 for return of the documents.

With regard to the earlier threat first alleged during trial, Xanpanya testified to the following conversation with Am Alstatt: "On that day I play soccer with [Mrs. Alstatt's] son

and then we were late coming home and maybe we did not go to help her at work, and she commented that when I was living with her, I should obey her." Filing No. 96, Tr. at 546:1-4. "As I remember, [Mrs. Alstatt] said to me once I'm here I have to listen to her. If I don't obey her, she can send me away, not just me. And she also said even her own son or her beloved son figure, if he doesn't listen to her, he can also be sent back as I could remember." Filing No. 96, Tr. at 543:21-544:1. The court notes that this conversation was not told to anyone prior to trial, including law enforcement. Even if believed, the court finds that this statement is vague and cannot be construed beyond a reasonable doubt to be a threat. A single statement in the context of a family gathering leads the court to believe the statement reasonably may be construed as mere hyperbole.

The court finds that the conversation recorded by Agent Bautch, *see supra* footnote 3, does not convey, beyond a reasonable doubt, that Am Alstatt is threatening to return Xanpanya to Laos for want of $25,000. Depending on the questioner, Xaypayna testified he alternately did or did not feel threatened by Am Alstatt's purported warnings that she would send him back to Laos. (Threatened: Filing No. 95, Tr. at 503:19-404:12, and Filing No. 96, Tr. 675:12-17; Not threatened: Filing No. 96, Tr. at 570:24-571:4, 575:12-24, 57720-576:5.) Considering Xaypanya's testimony as a whole and his demeanor during his testimony, the court finds that Xaypanya was not threatened by Am Alstatts "return to Laos" statements. Rather, he wanted to get out from under her financial thumb and he could not do that without his immigration documents. The recorded conversation evidences defensive posturing by Am Alstatt once Xaypayna questioned her refusal to return his documents.

The court does not have sufficient evidence to prove peonage or involuntary servitude beyond a reasonable doubt.[6]  Obviously, the Alstatts wanted to get their money. They expended considerable sums on behalf of both Xaypayna and Vilay.  Am Alstatt was adept at getting people into the United States.  She performed her services for a fee. There was an informal, although indeterminate, agreement that the immigrants would pay her the fee and expenses.  Although some witnesses testified they did not pay the Alstatts anything, there was a general understanding about the fees and the Alstatts' eventual payment.  Even Vilay admitted making a partial payment to the Alstatts for the plane tickets.  The contract Xaypayna signed also is evidence of this arrangement.

_____

[6]This case is unlike those where there is evidence of clear violations beyond a reasonable doubt. *See, e.g., United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009) (extensive threats to ship workers home, threats of arrest, evidence of fear, evidence of lengthy back-to-back shifts to make debt payments, isolation of workers); *United States v. Nnaji*, 2011 WL 5105786 (5th Cir. Oct. 26, 2011) (evidence sufficient to support forced labor and conspiracy where immigrant  was sole caregiver of three children, did not have her own room, husband repeated sexually assaulted her, she was not paid for more than eight years); *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) (evidence sufficient to show forced labor where defendant intended illegal alien to believe she would suffer financial, reputational, and immigration harm if she did not continue to work as a live-in nanny and housekeeper; evidence also sufficient to show document servitude, where defendant kept alien's passport in order to prevent her from leaving as live-in nanny and housekeeper; also, failure to pay for two years; repeated threats of sending her home; signed false statement that she had been paid minimum wage); *United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) (use of threats and torture to force woman to work 8 to 9 hours per day within terms of the forced labor statute).  In *United States v. Kozminski*, 487 U.S. 931, 952 (1988), the Supreme Court recognized that involuntary servitude requires evidence that "the victim [was] forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use of coercion through law or the legal process."  The jury may consider such factors as "evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities." Threatening "an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude." *United States v. Veerapol*, 312 F.3d 1128, 1132 (9th Cir. 2002); *United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010) (evidence sufficient to show husband's knowledge where husband witnessed his wife humiliate maids, cut maid on the face with a knife, and beat her with an umbrella; also husband reported maid eating food from the garbage and falling asleep while cleaning a bathroom) (sufficient evidence on aiding and abetting to show holding of maid in satisfaction of their debt); forced labor found where defendant and husband took travel documents, took money, kept her isolated, prohibited her from making contact with outsiders, did not teach her to use the phone, accompanied her wherever she went, and coerced victim into working for them.  *United States v. Nnaji*, 2011 WL 5105786 (5th Cir. 2011).

The court finds that there was a general agreement between the Alstatts and the immigrants that a financial debt was owed to the Alstatts. The debt was indeterminate and the Alstatts used it to their emotional and economic advantage. However, the court cannot find that this arrangement amounts to involuntary servitude by means of abuse or threatened abuse of law or legal process.

The Alstatts, for all of their faults, worked to bring family members out of Laos to the United States. The primary actor in this endeavor was Am Alstatt. She achieved this objective by whatever means possible. Mr. Xaypayna was her cousin. She arranged his marriage to a lottery winner to make him eligible to immigrate to the United States. She paid his immigration fees and transportation expenses to get to the United States. She arranged work for him in Minnesota, but he did not like that work. Then she paid his room and board and provided him a phone while he helped Ed Alstatt repair rental property. She took him on expense-free vacation trips. She helped him get his immigration and work documents. She found him a job opportunity and then trained him to get that job. She taught him how to manage his money. She obtained a joint checking account for him so that he would qualify for overdraft protection. She essentially let him manage his own money and helped him locate housing in Sioux City, Iowa, and Columbia, Missouri. She provided him a car with the mistaken understanding he would eventually purchase it. She invited and entertained him and all the relatives she helped bring to the United States for major holidays. She apparently provided similar efforts for other members of her family and other Laotians she helped immigrate.

With respect to the conspiracy to commit the substantive counts in Counts I and II, the court is not convinced beyond a reasonable doubt that the government has not proved

the elements of peonage under any definition.  Accordingly, the court finds in favor of both the defendants as to Counts I and II of the Indictment with respect to peonage, trafficking and involuntary servitude.

**Count II**

The defendants are also charged in Count II with substantive counts of peonage, in violation of 18 U.S.C. § 1581 (the old peonage statute) and 1594 (the new peonage statute), which requires proof that the defendants simply "attempted" to commit the crime of peonage, and willfully took some action that was a substantial step in an effort to bring about or accomplish the crime of peonage, thus aiding and abetting in the trafficking.

When it enacted the Trafficking Victims Protection Act in 2000 ("TVPA"), Congress declared that the purposes of the TVPA are to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." Pub.L. No. 106–386, § 102, 114 Stat. 1488 (2000) (codified as amended at 18 U.S.C. § 1589 *et seq*.).  In order to find defendants, or one of them, guilty of aiding and abetting, the court must determine that:

> A person may be found guilty of trafficking in peonage even if [he] [she] personally did not do every act constituting the offense charged, if [he] [she] aided and abetted the commission of trafficking in peonage.
>
> In order to have aided and abetted the commission of a crime a person must, before or at the time the crime was committed:
>
>> (1) have known that trafficking in peonage was being committed or going to be committed; and
>> (2) have knowingly acted in some way for the purpose of aiding the commission of trafficking in peonage[; and]
>> (3) have intended to aid and abet the trafficking of peonage.

Eighth Circuit Model Jury Instructions § 5.01.  18 U.S.C. § 2.

Again, the court finds the government has not met its burden in this regard.  The court has already determined that there is insufficient evidence of peonage and trafficking of peonage and the related causes of action.  Likewise, the court finds there is insufficient evidence of trafficking, aiding and abetting.  The government has not met its burden in this regard.  Accordingly, the court finds in favor of the defendants on Count II.

**Count III**

Count III of the Indictment charges both defendants with document servitude, aiding and abetting under § 1592,[7] in the course of violating or intending to violate the forced labor statute, 18 U.S.C. § 1589.  The first question is whether this statute creates an independent crime, or whether it is dependent upon a finding of peonage under Counts I or II.

The Eighth Circuit has not directly addressed this issue.  According to the Eighth Circuit, the government must show that the defendants (1) concealed, removed, confiscated, or possessed the workers' passports, visas, or other immigration documents;

_____

[7]18 U.S.C. § 1592(a) states:

(a)  Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person–

(1)  in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a);

(2)  with intent to violate section 1581, 1583, 1584, 1589, 1590, or 1591; or

(3)  to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000, . . . .

(2) did these acts in the course of violating the peonage statute with the intent to violate the statute; and (3) acted knowingly and intentionally. *Farrell*, 563 F.3d 376. In *Farrell*, the defendants brought nine immigrants to the United States for the purpose of having them work as housekeepers in their hotels. The passports and visas were confiscated immediately and retained throughout the workers' entire stay; numerous workers testified that they did not possess their passports while working and that the Farrells took control of the same; and the testimony specifically showed that the Chief of Police asked the defendants to turn over the workers' immigration documents and the defendants still refused. *Id*. at 376-77. The Eighth Circuit also stated: "In addition to having confiscated and knowingly possessed the passports, as outlined extensively above, *there was sufficient evidence that the Farrells had the intent to commit peonage and retained the documents while committing peonage*." (Emphasis added.) *Id*. at 377.[8] The court thereby seems to acknowledge that there must be a violation of the peonage laws or at least an intent to violate the peonage laws before there can be a conviction for document servitude.

However, the Second Circuit has directly addressed the issue and has determined that intent to violate the peonage or forced labor statutes is sufficient to support conviction. The Second Circuit stated:

> As already noted, Mahender does not directly challenge the sufficiency of the evidence to support his convictions for document servitude and conspiracy to commit document servitude. Instead, he argues that, because the evidence was insufficient to support his forced labor and peonage convictions, he necessarily cannot be guilty of the "derivative" offense of document servitude. Mahender's Br. 64. Mahender's argument is based on a fundamental misreading of the document servitude statute. . . . Mahender

---

[8]A recent Ninth Circuit case dealt with document servitude, but again, there existed a forced labor conviction. *United States v Dann*, 652 F.3d 1160, 1173 (9th Cir. 2011).

continually refers to this crime as an offense that is merely "derivative" of the forced labor and peonage crimes. This is incorrect: a defendant may be convicted under § 1592 for knowingly concealing immigration documents merely "with intent to violate" the forced labor or peonage statutes. 18 U.S.C. § 1592(a)(2).

*United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010). On its face, it appears that §1592 can be fulfilled merely by restricting the person's liberty to move by holding his documents if it is in conjunction with the intent to create or further peonage or forced labor. The court agrees with the Second Circuit that this is not a derivative claim, but it can in fact stand on its own with only a showing of intent to commit peonage. However, the court cannot find beyond a reasonable doubt that the defendants intended to commit peonage or forced labor for many of the same reasons outlined above.

Specifically, with respect to document servitude, the court finds that defendants did in fact take and conceal the passports and other immigration documents from Xaypayna probably as security for the payment of debts the defendants believed Xaypayna owed for his immigration fees, the alleged car purchase and interest on the debt. Although the testimony is at odds in this regard, the court credits Xaypayna and Teng in this respect. The defendants kept Xaypayna's immigration documents and would not return them when asked to do so. However, the government did not prove that the defendants did so with the intent to commit peonage.

Essentially the defendants arranged work for both immigrants outside Omaha with disinterested third-party employers. Both immigrants had access to their earnings although the defendants had access to the same funds. Both immigrants were free to live on their own and conduct their lives as they pleased. Although subject to an amorphous debt obligation, they were otherwise free to live their lives. Xaypanya's New Orleans work was

the only exception.  Notably, during most of his New Orleans work Xaypanya maintained possession of his passport.  His green card and Social Security card were in process and eventually sent to Omaha.  He testified that he possessed all three documents until shortly after he moved to Columbia, Missouri.  The court finds that document peonage during the New Orleans trip is not supported by the evidence.

The court in no way condones the defendants' behavior of subjecting Mr. Xaypayna to an amorphous debt and withholding his documents as security for that debt.  However, the court cannot find beyond a reasonable doubt that the government proved the defendants intended to commit peonage without evidence that the subject immigrants were forced or coerced to work for the defendants, either directly or indirectly.  Both immigrants wanted to work, and apparently enjoyed their new-found careers and freedom.  The court finds the defendants not guilty of Count III, document servitude.

**Count IV**

In Count IV, defendant Am Alstatt is charged with making false statements in violation of 18 U.S.C. § 1001, with respect to Thongsavath Sinthavong's ("Applicant") N-400 Application for Naturalization.  There are three essential elements to the crime of making a false statement to a governmental agency.  First, the defendant knowingly, voluntarily, and intentionally made a false or fictitious statement or representation in a matter within the jurisdiction of the Department of Homeland Security; second, the statement or representation was material to the Department of Homeland Security; and third, the Application for Naturalization submitted by Am Alstatt on behalf of a Laotian national was a matter within the jurisdiction of the Department of Homeland Security.  *See* Eighth Circuit Manual of Model Jury Instructions 6.18.1001B, and cases cited therein.

The Model Instructions define a "false" or "fictitious" statement as one that is untrue when made, and then known to be untrue by the person making it or causing it to be made. A statement or representation is "fraudulent," if known to be untrue, and made or caused to be made with the intent to deceive the governmental agency to whom it was submitted. The Model Instructions further define material as having "a natural tendency to influence, or is capable of influencing, the decision of the agency." "[However, whether a [statement] [representation] is 'material' does not depend on whether the agency was actually deceived.]" *Id.* "[M]ateriality involves only the capability of influencing an agency's governmental functions, i.e., does the statement have a 'natural tendency to influence or is it capable of influencing agency decision?'" *United States v. Whitaker,* 848 F.2d 914, 916 (8th Cir. 1988); 18 U.S.C. § 1001; Eighth Circuit Model Jury Instructions 6.18.1001B.

During the search, ICE agents discovered documents for Sinthavong located in the defendants' safe. The documents disclosed that Sinthavong had prior misdemeanor convictions. Am Alstatt omitted this criminal history from the N-400 Application. The government argues that Am Alstatt falsified statements on the N-400 Application as outlined in Filing No. 92, Tr. Ex. 502 and Ex. 503.

The defendant argues that the government must prove willful intent to defraud with evidence of specific intent. Mistake or inadvertence is insufficient to prove intent to defraud. Am Alstatt contends the government failed to show that the statements on the form were made with the intent to deceive Homeland Security. She testified that she simply forgot to include Sinthavong's criminal history and record on the form. She argues that Sinthavong gave information over the phone for his application to Ed Alstatt in the summer of 2007. *See* Pl. Ex. 503. Later, argues Am Alstatt, the defendant received faxed

information from the application that contradicted what he had given over the phone. This information showed two criminal convictions. Am Alstatt wrote on the fax to indicate to Sinthavong that he had a "50/50 chance to get Citizenship it up to him to do it." Ex. 507. The fax cover sheet also bears the words: "Gross Mis 1." The Applicant's file included a copy of the Minnesota statute which prohibits the particular criminal offenses in question. Ex. 513. She forgot this information when the application was submitted. She did testify, though, that she told Sinthavong to correct the misstatement with the immigration officials. Thus, argues Am Alstatt, there is no evidence that shows she intended to mislead the government agency and, further, this mistake was not material in any event.

The chronology of events relating to the documents supporting this count is important. The fax transmission from the Applicant to Am Alstatt is dated August 29, 2007 (confirmed in writing and on the fax data stamp). Ex. 507. The fax contained twelve pages which include copies of the following documents: a 2001 order of expungement for a 1999 conviction, Ex. 512; an August 21, 2007, order sealing a 2004 conviction, Ex. 508; criminal records searches, Exs. 509-511; and a copy of the Minnesota statutes covering both convictions, Ex. 513. The N-400 application was signed by the defendant on October 17, 2007, and was approved on May 22, 2008. Ex. 503. The government did not discover any of this information until the defendants' premises was searched on April 21, 2009, long after the application was approved.

There is sufficient evidence that Am Alstatt knew of the Applicant's criminal convictions, purposefully did not include them in the application, and advised the Applicant the convictions gave him only a fifty-fifty chance of obtaining citizenship. This conduct is consistent with her approach to the immigration of Xaypanya, his "wife" Lattachack and

Vilay. Assuming, arguendo, that she advised the Applicant to correct the statement before the interview, then she herself had sufficient time to correct the application. She did not. The court does not credit Am Alstatt's assertion that she told the Applicant to correct the information during his interview or that she simply forgot to include it when she signed the form. Given her participation in falsifying previous immigration documents, her many ambiguous responses during her examination and her motivation to avoid conviction, the court does not give her testimony in this regard any weight.

As to the second element of materiality, the government entered into evidence United States Citizenship and Immigration Services publication M-476, "A Guide to Naturalization." Ex. 514. The publication's contents are not contested by the parties. The pamphlet clearly states that failing to identify criminal convictions, even if expunged, can result in an applicant being denied naturalization even if the crime(s) reported would not be a bar to citizenship. Ex. 514 p. 25. Furthermore, by her own admissions first reflected on the fax cover sheet and later by her testimony, she told the Applicant to divulge the information to the immigration authorities. She estimated on the fax cover sheet that the Applicant had a fifty-fifty chance for acceptance. There is no doubt the defendant understood the materiality of the Applicant's criminal convictions. The court finds the false statements made by Am Alstatt are material.

The third element concerning jurisdiction is not contested.

The court finds that the government proved the elements of making false statements beyond a reasonable doubt against the defendant Am Alstatt.

THEREFORE, IT IS ORDERED:

1. The court finds the defendants not guilty of Counts I, II, and III of the Indictment.

2. The court finds the defendant Amphayvanh Alstatt guilty of Count IV of the Indictment.

3. A presentence investigation is ordered.

4. A separate sentencing scheduling order will be entered.

DATED this 14th day of March, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge